No. 18,121.

FILM ENTERPRISES, INC. *v.* SELECTED PICTURES, INC., ET AL.
(335 P. [2d] 260)

Decided February 2, 1959.   Rehearing denied February 24, 1959.

Messrs. HODGES, SILVERSTEIN, HODGES & HARRINGTON, Mr. JAMES B. REED, for plaintiff in error.

Mr. EDWARD MILLER, for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

PLAINTIFF in error, plaintiff in the trial court, will be referred to herein as Film. Defendant in error Selected Pictures, Inc., will be referred to as Selected, and de-

fendant in error John M. Wolfberg will be referred to as Wolfberg.

In *Film Enterprises v. Selected Pictures* (1957), 134 Colo. 451, 306 P. (2d) 252, we upheld the trial court in its denial of Film's motion in this case that the executrix of Harris P. Wolfberg's estate be made a party to this action, Harris P. Wolfberg having died on February 25, 1954. In *Film Enterprises, Inc. v. Selected Pictures, Inc.* (1958), 137 Colo. 84, 321 P. (2d) 218, we held that there was no final judgment on Film's claim against the Harris P. Wolfberg estate pending final action in the case now before us.

In the instant case the trial court entered its findings of fact and judgment denying Film recovery upon a certain film rental contract and denied Film the right to proceed with the second phase of its case wherein it had alleged that the Wolfbergs as directors of Selected had improperly transferred assets from Selected so as to render it unable to pay a judgment if it obtained one in this action.

The record discloses that on March 25, 1948, six years before trial, a contract was executed with Film on behalf of Selected, in the manner hereinafter set forth. At that date Tom H. Bailey was president of Selected. Though the record is confused on this point it appears that at the time in question here John M. Wolfberg and Harris P. Wolfberg with Bailey constituted the Board of Directors and were the sole stockholders in Selected. The Wolfbergs in effect played the role of silent partners because of Bailey not wanting to be publicly associated with them — yet John Wolfberg testified they kept abreast of company affairs and dealt with it in placing and securing films. It appears that Bailey had borrowed $3,000.00 from a bank to help one H. V. George start Film for the purpose of distributing a film known as Sundown Riders and if George got back his investment of $36,500.00 in the film, then Bailey was to have a one-half stock ownership in Film. Only three qualifying

shares of stock were issued in Film and George has never received his investment although sufficient rentals of Sundown Riders came in to repay Bailey's loan.

In the contract in question Selected agreed to purchase from Film the right to exhibit in a defined area of the United States the movie film in question and pay therefor the sum of $8,170.00. None of this price has been paid and Film alleges there was to be in addition (under the contract) a purchase of one print of said film by Selected for $108.00. Selected on the other hand now urges that the purchase of the print was a separate transaction.

We note that Selected's final "Amended Answer and Counterclaim," in the numerous pleadings, states:

"5. It admits that one print of the motion picture known as 'Sundown Riders' was delivered to the defendant corporation, but denies the other allegations of Paragraph 5.

"6. It admits that the defendant corporation agreed to pay the sum of One Hundred Eight Dollars ($108.00) for the said print. It denies the other allegations of Paragraph 6."

Film's final "Amended Complaint" states:

"5. Pursuant to and in accordance with the provisions of Paragraphs 2 and 4 of said agreement, one print of said motion picture were (sic) ordered by the defendant corporation; said order was accepted by plaintiff; and delivery was made by the plaintiff.

"6. By Paragraph 3 of said agreement and other provisions of said agreement and defendant corporation agreed to pay a sum in the amount of One Hundred Eight & No/100 ($108.00) Dollars, over and above the amount agreed to be paid for the license as appears above, for the said one print."

The agreement in dispute as attached to the amended complaint reads in pertinent part in regard to the above matter:

"2. The Licensor agrees to furnish the Licensee as many positive prints of said motion pictures as Licensor

in its sole judgment may deem commercially profitable and necessary for use in said territory at prices hereinafter set forth. The Licensee hereby orders ten prints with respect to each such motion picture and the Licensor hereby accepts such orders. Such prints shall be delivered at the times hereinafter set forth, upon the terms and conditions hereinafter set forth, and delivery of such prints to the Licensee shall be deemed to be delivery of the motion pictures embraced herein, for all purposes, under this agreement.

"3. The Licensee agrees to pay to the Licensor, in consideration of the license herein mentioned, the total sum of $8,170.00 and no further payments or percentage.

"The licensee further agrees in addition to such license fee, to pay to the Licensor for each such motion picture, a sum equal to (.01958) market price per lineal foot for each print, based upon the prevailing market prices, and in case that at any time during the term of this license such prevailing market prices shall be increased, then the prices, hereinabove fixed, shall be increased proportionately. The Licensee shall also pay to the Licensor the cost of cans, containers, packing cases and the cost of handling.

"4. The Licensor shall deliver and the Licensee shall accept delivery of all prints at the laboratory, and such delivery shall be made F.O.B. such labbratory (sic) when tendered by the Licensor.

"The Licensor agrees to deliver a negative, or negatives, of the motion pictures herein mentioned to a laboratory designated by it located in

> Consolidated Laboratories,
> 959 Seward St.,
> Hollywood, California

where such negative, or negatives, shall remain for a period not to exceed three years during which time the Licensee shall have the right to order positive prints therefrom for the purposes of this agreement to a maximum number of ____ prints, and no more, at the Li-

censee's sole cost and expense, without any responsibility for the payment therefor on the part of the Licensor."

During the trial Film amended its complaint to indicate that the sum due Film was $5,000.00 and asked that its prayer for judgment be reduced accordingly. This arose because George, evidently through error, had written a letter before trial stating that the total sum due was $5,000.00; this difference had no relation to actual payments made for none had been made on the contract.

The evidence is that John Wolfberg and Bailey saw the picture exhibited in Denver and that thereafter the contract here challenged was entered into. The film was then distributed by Selected and undisclosed sums received therefor. The print of the film above referred to was retained by Selected in the Denver Film Exchange and produced by it from that source at the trial.

Two of Film's witnesses, Bailey and George, testified that they believed that Frank Childs, Selected's office manager, was present several times when the contract was discussed before its execution. Childs' testimony in regard to whether the contract was discussed with him was "I have no recollection that I was (consulted)."

The record does show that Tom Smiley assumed the duties of manager at Selected after Bailey and his employee there Frank Childs left and that he found no record of the contract in the company files "two or three months" later. No witness seemed to know for sure whether Selected continued to distribute the film after Bailey left the company, but that it did retain the proceeds from all showings is admitted.

The contract in question was executed on behalf of Film by George and on behalf of Selected by Bailey who signed the name of Childs thereto without disclosing on the contract or expressly disclosing to Childs his so doing. The undisputed evidence is that Childs was not present the day the agreement was executed and that Bailey testified he signed Childs' name because his was

the name then being used on other company film contracts. Childs at the time was the office manager of Selected under Bailey's supervision and had been expressly instructed and authorized by Bailey to execute checks and contracts on behalf of Selected. However, it appears that Bailey also had authority to execute contracts for the company.

The trial court found that the evidence failed to prove that Selected or its directors (other than Bailey) were aware of the existence of the contract in issue and that ratification therefor could not have been made. The court further found from the evidence that no records existed in defendant's files concerning the contract alleged to have been made. Further pertinent findings by the trial court were:

" * * * it can be conclusively said that one Bailey, president of the defendant corporation, acquired a stock interest in the plaintiff corporation and loaned it money; that while having a financial interest in the plaintiff and defendant corporation, he surreptitiously forged the name of the manager of the defendant company to a contract whereby it was agreed that defendant corporation was to pay to the plaintiff corporation the sum of $8,170 for a film known as 'Sundown Riders.' And that he never disclosed his acts and conduct or his interest in the plaintiff corporation to the directors of the defendant corporation.

"Such conduct will not permit a Court to ratify such action upon a suit to enforce the terms of the contract.

"No place in the evidence has the plaintiff corporation sustained the burden of proof in showing that the contract was a legal obligation of the defendant corporation * * *."

█ Under the facts presented in this record we must conclude that the learned trial court was in error for two reasons. First, we do not believe the contract in question to have been *forged* within the generally accepted meaning of that term. Second, the undisputed

evidence is that Bailey was the president of Selected and was fully authorized to manage its affairs in securing and distributing films. His knowledge and acts were those of the corporation and unless the contract is the type of unfair agreement hereinafter discussed, it is enforceable against Selected.

Under this record it is clear that Bailey as president had the actual power to execute this contract for the corporation. We also conclude that he had the implied power to sign for the corporation using his appointee's name even though the appointee did not know about it at the time. This was the corporation's contract not that of Bailey or his appointee Childs. Intent within the meaning of our forgery statute (C.R.S. '53, 40-6-1) could not apply here because the instrument was exactly what it purported to be; viz., a contract between two contracting entities.

Even if this contract had been forged the evidence is that Selected in fact ratified it by distributing the film and keeping the proceeds. Though the evidence as found by the trial court is that Bailey "never disclosed his acts and conduct or his interest in the plaintiff corporation to the directors of the defendant corporation," we must keep in mind that the other two directors of Selected had authorized Bailey to operate this company and to contract for film; that at least John Wolfberg knew of this film before it was contracted for and he was in this type of business for many years; that John Wolfberg's own testimony was that the Wolfbergs tried to keep up on the company's activities and the implication is clear that he knew that Selected was distributing this film before he actually knew the contract terms.

Bailey's knowledge and acts must be presumed to be those of the corporation when he acted within the scope of his employment. Under the evidence here it was improper for the trial court to conclude that Bailey had any duty to report to the other directors each and

every contract entered into as part of the company's regular business as soon as executed.

Selected urges that the contract was not fair and that there was no ratification of it, thus the question of forgery *vel non* is not conclusive.

In this connection it is urged that the evidence called for the application of the doctrine of vigorous scrutiny of the contract because "The dual interests of Bailey as a *dominant* member of both the plaintiff and defendant corporations prevented an arm's length transaction." Film further alleges that because of Bailey's common interest this instrument is *"void* and unenforceable." (Emphasis supplied.)

Although we do not deem such a contract as this to be void as urged, yet because of Bailey's dominant position in Selected, and disputed connection with Film, this is the type of situation which calls for a close judicial scrutiny to determine the absence or presence of fraud and unfairness and could result in a voidable contract. See Note to 33 A.L.R. 2d 1064, 1071. Courts often say in regard to this type of transaction:

"To determine whether they meet the standards imposed on them, contracts between corporations having common officers and directors are jealously regarded and closely scrutinized.

"Where the test of validity is fairness it has been generally held that once the validity is challenged, the burden of proving fairness is imposed on those seeking to sustain the transaction." Notes to 33 A.L.R. 2d 1064 and to 1072.

Numerous authorities are cited by the editors in regard to the above propositions. No adequate evidence of the alleged unfairness in this agreement appears in this record. Selected's witnesses who attempted to testify as to what was paid for other films had their testimony properly stricken as immaterial. Its witness Smiley, who had never seen this picture, admitted there were different ways to contract for states-rights pictures and

that this was one of them. He had no idea how much this film could bring in. Some of Selected's witnesses described how films are handled in the business, but only one, John Wolfberg, had seen this film — he thought it was of average or less quality with no star. Even though the burden of proving fairness would shift to Film once the challenge was made, none of Selected's evidence proved fraud or unfairness. Even though the record fails to disclose adequate evidence by Film, showing the contract to be fair, such was not necessary because of the ratification of the agreement *after* Bailey left Selected. This being so the trial court should not have based its decision in part on the issue of fairness of the contract.

We number ourselves as in accord with the rule cited by Selected as to the burden of proof in this type of case, but in applying it to the facts before us we have difficulty in arriving at the same conclusion as did the trial court for the reason that the evidence here, as we have previously pointed out, establishes a ratification of the agreement by Selected, in using the film and retaining the proceeds. The burden of proof was carried by Film in this regard. We further point out that in its answer Selected expressly admitted those two vital facts by pleading:

"3. The defendant corporation, acting through the said Bailey, has permitted the exhibition of the said motion picture and has collected small amounts therefor. The said Bailey is obligated to this corporation in excess of the amounts so collected and such amounts have been withheld pending the settlement of accounts between this defendant and the said Bailey. This defendant offers to pay to the plaintiff any amounts found due to the plaintiff, less proper charges in accordance with the custom of the business in such amounts as may be found to be due in the event this Court finds that the defendant is without authority to withhold such amounts pending the settlement of accounts between this defendant and the said Bailey."

We find no proof in the record of the alleged small amounts or their total admitted to be due Film; and as Bailey is not a party to this action it is obvious that any withholding of the rentals, whether large or small, must in law be deemed to have been an acceptance of the benefits and thus a ratification by Selected *after knowledge* of the circumstances.

The general rule is that the burden of proof to show ratification of a contract with full knowledge of all the material facts, is on the party alleging it. 2 Fletcher Cyc. Corp. (1954), 1182, §780. Ratification implied from acts of a principal may take place only when the principal has full knowledge of all circumstances surrounding the transaction. *Montrose Land and Inv. Co. v. Greeley National Bank* (1925), 78 Colo. 240, 241 Pac. 527. That test has been met here.

In law the deliberate withholding by Selected of payments acknowledged to be due Film resulted in an adequate ratification of this contract to bind Selected regardless of the fairness or unfairness of the contract and of Bailey's controversial role in its execution.

The judgment is reversed and the cause remanded with directions to enter judgment for Film together with its costs against Selected, and for further proceedings to hear and determine the second allegation of Film relating to the alleged improper disposition of Selected's assets.

MR. JUSTICE DOYLE not participating.